UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROLLA G. TRENT, individually and as Administrator of the Estate of Shirley Trent, decesased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 3:06-CV-409 PPS |
| RODNEY L. RICHARD and THE CITY OF PERU, | ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

It is difficult to imagine just how tragic the circumstances of this case are.  Shirley Trent was delivering newspapers early one morning when Officer Rodney Richard of the Peru, Indiana Police Department, while responding to an emergency, came over the crest of a hill and hit her head on, killing her. The emergency call that Officer Richard was responding to was actually at the home of his parents.  Officer Richard's brother had tried to kill himself, and his mom had called 911 seeking help.  Richard was the responding officer.  Rolla Trent, Ms. Trent's widower, as administrator of her estate, sued Officer Richard and the City of Peru, both of whom seek summary judgment. [DE 44, 47]. The case was filed in state court and removed here by the defendants.

This case compounds calamity with tragedy, but unfortunately for Plaintiff, relief does not exist in federal court.  The facts fit squarely with similar cases coming before it, and those opinions have determined that persons injured or killed in accidents with police officers responding to emergency calls or involved in high speed chases are required to show intent to harm in order to bring a constitutional substantive due process claim.   Those cases do not allow

for Plaintiff to distinguish itself on the basis that Richard was speeding to his parents home because of a combination of both personal and job-related motivations. Accordingly, Plaintiff's federal claims must be dismissed, and the rest of the case remanded to state court.

## **FACTUAL BACKGROUND**

Officer Richard is a member of the Peru Police Department. (Richard Aff. ¶ 1.) In the early morning of December 21, 2004, at around 2:30 a.m., Richard was participating in a shift meeting organized by his supervisor, Sgt. Dan Sofianos. (*Id*. ¶¶ 1-2.) At that time, he overheard a dispatch sending Deputy Jumper of the Miami County Sheriff's Department to a home residence to investigate a suicide call. (*Id*. ¶ 3.) Richard recognized the address as the one belonging to his parents. (*Id*.) After following up with dispatch, he learned that the suicidal subject was a 38-year-old male who had consumed 50 to 100 Tylenol pills and that there was an ambulance on its way. (*Id*.) The 911 call was made by Richard's mother, Patricia. (*Id*.) Richard was confident that the suicidal subject was his brother William, whom Richard knew to be a crack-cocaine user. (*Id*.) Based on past experience, Richard also felt that William could be a threat to himself and others, but that he would be less likely to be violent with Richard on the scene than other police officers. (*Id*. ¶¶ 3-4.) Richard's parents had obtained emergency custody of William's children, so Richard was aware that those children were also in the house. (Rodney Richard Dep. 10-11.)

Richard immediately requested permission from Sgt. Sofianos to respond to the call and assist Deputy Jumper from the Miami County Sheriff's Department. (Richard Aff.. ¶ 4.) He informed Sofianos that William would probably be out of control when other officers arrived on the scene, explaining that his brother usually doesn't get along with the police. (Sofianos Dep. 22-23.) Sofianos believed the call was suitable for response from the City of

Peru Police Department because it was a medical emergency.  (*Id*. 29-30.)  He thought Richard would arrive there first, even before the Sheriff's Department officers.  (*Id*. 23-24.) Sofianos also testified that paramedics will frequently refuse to enter the residences of suicidal subjects without an officer present, unless the subject is unconscious.  (*Id*. 23.)

There was nothing unusual about City of Peru officers responding to emergency calls located outside of the city, owing to a lack of manpower in the Miami County Sheriff's Department, especially on the overnight shift; indeed, it was common.  (*Id*. 29; Richard Aff. ¶ 7; Jumper Dep. 20-21.)  After Sofianos gave Richard permission to leave, Richard departed the shift meeting. (Sofianos Dep. 23.)  Richard did not clock out and was wearing his uniform when he left.  (*Id*.; Richard Aff. ¶ 6.)  Sofianos considered Richard to still be on duty and to be acting within the scope of his employment as he responded to the emergency call.  (Sofianos Dep. 28.)

Plaintiff disputes that Richard responded to the call for anything other than personal motivations.  He notes that it is standard procedure, by Richard's own admission, for police to obtain all possible information before arriving at a scene and yet Richard did not call his mother after hearing the dispatch. (Rodney Richard Dep. 28.) In addition, this was apparently not William's first suicide attempt or suicide threat.  (Patricia Richard Dep. 13-14.) Upon being informed that William had taken 50 to 100 Tylenol on the morning of December 21, 2004, both of William's parents thought, "here we go again."  (*Id*. 22-23; Carroll Richard Dep. 15.)  Patricia felt that she did not need her son, Officer Richard, there at the house and did not call him because she thought she could handle the situation herself.  (Patricia Richard Dep. 31.)  Carroll Richard did not even leave work.  (Carrol Richard Dep. 15-16.).  Officer Richard was unaware of any times where William had been violent after an attempted or threatened suicide. (Rodney Richard Dep. 11.)

Plaintiff also notes that Officer Richard and Sgt. Sofianos did not specifically address whether he was responding to the call as part of his police duty or in a personal capacity, and he did not ask permission to treat the call as an emergency. (Sofianos Dep. 25, 31.) Carroll Richard did not recollect ever seeing a City of Peru Police Department vehicle drive by his house, but has seen vehicles belonging to county police departments. (Carrol Richard Dep. 24.)

Sadly, before Richard made it to his parents home that night, his vehicle crashed into the one driven by Shirley Trent, resulting in her death. Richard did not see Ms. Trent, who was in her car delivering newspapers, until he reached the crest of a hill in his own car. (McCullough Dep. Ex. B, at 1.) Witnesses say Richard was driving without emergency lights and sirens shortly before the collision. (Leroy Rushing Dep. 18; Jane Rushing Dep. 22-23.) The police reconstructionist, Master Trooper McCullough, reported his finding that Richard was traveling a minimum of 94 miles per hour at the time of first braking. (McCullough Dep. Ex. B, at 2.) Richard disputes that he was traveling that fast, claiming he was driving something closer to 60 or 65 miles per hour. (Richard Aff. ¶ 10.) However, Richard admitted that he had his speedometer blacked out so as to prevent a reflection from appearing in the windshield while he drives at night. (Rodney Richard Dep. 60-61.)

Richard claims he had no intent to harm or injure Trent while driving toward his parents' house that evening. (Richard Aff. ¶ 17.) He says he hit his breaks immediately upon seeing Trent's vehicle. (*Id.*) Plaintiff has offered no evidence that Richard intended to injure anyone.

**DISCUSSION**

Plaintiff claims that Officer Richard's actions shock the conscience and thus amount to a substantive due process violation.[1]  Based on controlling cases from both the Seventh Circuit and the Supreme Court, I disagree.

A.      Requirements Under The Shocks The Conscience Standard

The Constitution is not a set of tort laws.  *See Daniels v. Williams*, 474 U.S. 327, 332 (1986).  It is for this reason that, when it comes to executive action, "only the most egregious official conduct" can be said to violate someone's substantive due process rights.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  The "shocks-the-conscience" standard is used to determine whether an executive action rises to the level of a constitutional injury.  *Rochin v. California*, 342 U.S. 165, 172-73 (1965).  This standard is purposefully set high, as "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *Lewis*, 523 U.S. at 848.

The standard for what "shocks the conscience" and what does not is, at best, murky.  The necessary elements supporting a shock-the-conscience claim vary depending on the category of action taken by the state official, but in many situations, intent to do harm is a requirement of any substantive due process claim.  *Id*. at 850-51.  "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  *Id*. at 848.  For example, for certain situations, a showing of deliberate indifference is all that is required to prove Fourteenth Amendment claims.  *See*

---

[1] Defendants presented arguments as to why any of Plaintiff's Fourth Amendment claims should be dismissed.  However, Plaintiff conceded that it is only asserting a Fourteenth Amendment substantive due process claim and states that "no further discussion is warranted" with respect to Fourth Amendment seizure law. *See* Pl's Response [DE 56] at 10.

*e.g.,Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003)(holding that a pre-trial detainee is entitled to protection against deliberate indifference as to his basic needs).

However, an automobile accident involving police officers responding to emergency calls is not one of those situations.  *See Carter v. Simpson*, 328 F.3d 948, 952 (7th Cir. 2003)*.*  High speed chases and emergency calls, by their very nature, do not allow time for "deliberation."  *Lewis*, 523 U.S. at 853; *Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir. 2003); *Carter*, 328 F.3d at 952*.*  The Supreme Court and Seventh Circuit have been very specific that a showing of intent to harm is necessary before an injury stemming from a high speed police chase, as in *Lewis* and *Bublitz*, or a response to an emergency call*,* as occurred in *Carter*, can amount to a constitutional injury.  "The *sine qua non* of liability in cases analogous to high-speed chases*,* therefore, is a purpose to cause harm."  *Bublitz*, 327 F.3d at 491 (quoting *Schaefer v. Goch,* 153 F.3d 793, 798 (7th Cir. 1998)).  This is an extremely high standard to meet.  *See Lewis*, 523 U.S. at 848 ("It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability.") Here, there is simply no evidence that Officer Richard was trying to harm Ms. Trent, and the proof is actually to the contrary.

The fact that the defendant here was responding to an emergency call that affected him personally does not move Plaintiff's burden to a less demanding definition of shock-the-conscience.  In other words, he must still show an intent to cause harm, not merely a deliberate indifference or a gross negligence with respect to safe driving procedures.  This issue was addressed directly in *Steen v. Myers*, 486 F.3d 1017, 1023 (7th Cir. 2007), where the estate of a motorcyclist injured during a police chase claimed that the defendant officer was "motivated by personal animosity and a desire to inflict harm" on the decedent motorcyclist.  In *Steen*, the

decedent rode away from the officer while the officer was attempting to pull him over for a traffic stop. *Id*. at 1019. The estate claimed that the motorcyclist fled the officer because of earlier run-ins and confrontations between the two. *Id*. Accepting the facts in the best light for the estate, the court assumed the existence of personal animus between the officer and the motorcyclist. *Id*. at 1023. Nevertheless, despite the earlier confrontational history, the court noted that a legitimate government interest was served by the officer's pursuit during a traffic stop, and that the estate's claim still required evidence of "conduct intended to injure in some way unjustifiable by any government interest." *Id*. (quoting *Lewis*, 523 U.S. at 849.)

      This case presents a fact pattern much less egregious than *Steen* does. Unlike *Steen,* the Plaintiff here does not allege any personal animus between the decedent and Officer Richard. There was unquestionably a strong personal interest which motivated Richard's actions that night, but there is also no evidence opposing the fact that he was pursuing government interests as well. Richard knew his brother was a crack user and potentially unstable. Richard was in a good position to minimize any potential violence between his brother and other officers and emergency personal. Dan Sofionos, Richard's supervisor, testified that he allowed Richard to drive to his mother's home because Richard had informed him that his brother would likely be "out of control" when other officers arrived. Richard's ability to calm his brother down would be of most use if he arrived before the others did. Sofionos believed Richard would be the first officer on the scene, and that paramedics usually will not enter the home of a suicidal subject before officers arrive. Further, it was not uncommon for Peru officers to respond to an emergency call outside the city, owing to the lack of police officers working for the rest of Miami County at night. Richard was one of the few Peru officers on duty at the time of the call. He did not clock out and Sofionos said that he was acting under the scope of his employment when he responded to the emergency.

A suicide attempt can be called nothing other than an emergency, and a rapid response is inherently in the government's interest.  The community benefits if the best qualified police officer is sent to respond to emergency calls. There is undisputed evidence that Richard's relationship with his brother, including his knowledge of his brother's expected behavior with unknown police officers, made Richard a good candidate to send to the scene.  As *Steen* shows, a mixture of personal and professional motivation does not place an officer under greater risk of liability for violations of substantive due process.  Nor should it, as the alternative rule would risk creating unwanted hesitancy among our police officers whenever responding to calls involving individuals they happen to know.

While Plaintiff tries to paint this unfortunate episode as "purely personal," all the evidence suggests that Richard's actions were motivated by an overlapping combination of personal and employment-related interests.  Even taking the facts in the best possible light for Plaintiff, there was at most an overestimation on the part of Richard and Sgt. Sofianos as to how much of a threat William represented to himself and others.  There is nothing to suggest that Richard lied about his belief that William's condition posed a significant risk or that Richard could help diffuse the situation if he responded quickly.  Although this may have been a poor judgment, it does not create constitutional liability.   There is no evidence of intent to cause harm unrelated to a government interest, and so Plaintiff's federal claim must fail for failing to meet the shock-the-conscience standard.

**B**.     **Under Color Of State Law**

Even if the Plaintiff was correct and Officer Richard's action were "purely personal" such an argument is self-defeating.  This is because if true, it would take the action outside the realm of § 1983, which requires that a defendant be acting "under color of state law." *See Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (citing *Kramer v. Village of North Fond du Lac*, 384

8

F.3d 856, 861 (7th Cir. 2004.)  For example, in *Estate of Sims v. County of Bureau*, 506 F.3d 509, 515-16 (7th Cir. 2007), the Seventh Circuit found a sheriff to be "off on a frolic" when he showed up at a journalist's door to harass her about a negative article written about him. The complaint alleged that the sheriff concocted a phony investigation and created a letter falsely accusing the plaintiff's husband of felonious conduct. *Id*. The journalist suffered a fatal heart attack after the sheriff confronted her with the letter, and her estate sued under § 1983.  *Id*. at 513.  The Seventh Circuit found that the sheriff took his actions only to protect a personal interest, and there was no "misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Id*. at 515-16 (citing *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988).  In this case, Plaintiff contends that Officer Richard drove recklessly because of purely personal motivations.  If so, he was like the sheriff in *Sims* and similarly "on a frolic" for which he cannot be liable as a state actor under § 1983.

**C.      Qualified Immunity**

Officer Richard is also entitled to qualified immunity.  "Public officials performing discretionary functions are entitled to qualified immunity from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Gustafson v. Jones*, 117 F.3d 1015, 1020-21 (7th Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  Once a defendant raises a qualified immunity defense, the plaintiff must show, "first, that there has been a violation of one or more of her federal constitutional rights, and second, that the constitutional standards at issue were clearly established at the time of the alleged violation."  *Campbell v. Peters*, 256 F.3d 695, 699 (7th Cir. 2001) (quoting *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999)).

Even were I to agree that the shock-the-conscience standard in this case did not require the showing of an officer's intent to cause harm, I could not say that this definition was clearly established at the time of Richard and Shirley Trent's car accident. "In delimiting the contours of a right, we look first to case law on point or in closely analogous areas because it permits us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) (citations and quotation omitted). All of the cases that are most analogous - *Lewis, Bublitz, Carter, Steen* - all require the element of intent to harm for individual liability under the Fourteenth Amendment to accrue to a police officer involved in an accident during a chase or emergency response. Plaintiff does not cite to any cases, since *Lewis*, that approaches an opposite holding. The three cases that Plaintiff does cite to were all issued prior to the Supreme Court's *Lewis* opinion. The first two do not discuss whether intent is a requirement for liability. *See* Pl's Response [DE 56] at 16 (citing *Evans v. Avery*, 100 F.3d 1033, 1038 (1st Cir.1996)(holding that an officer's deliberate indifference to a victim's rights was not sufficient to meet the shock-the-conscious standard in a police pursuit case); *Fagan v. City of Vineland*, 22 F.3d 1296, 1306-07 (3rd Cir.1994) (finding reckless indifference to be insufficient to meet the shock-the-conscience standard.)) In the third and oldest of the three cases, the Tenth Circuit found that reckless intent may violate § 1983 if the officer was aware that obvious risks were so great that it was highly probable that serious harm would follow, but nevertheless granted summary judgment based on qualified immunity because the law was not clearly established. *Medina v.City and County of Denver*, 960 F.2d 1493, 1496-97(10th Cir. 1992).

Plaintiff's own brief does not do much with these cases to advance its argument, only using them to support the statement that, "many courts have held that a police officer's improper

10

conduct, even during a high-speed pursuit, may violate an injured parties [sic] Fourteenth Amendment substantive due process right to life." *See* Pl's Response [DE 56] at 15-16.  I do not disagree with this conclusion in the least, but it provides no insight to the question of whether intent to harm is necessary to find such a constitutional violation when the injury occurred during a police chase.  At best, the Plaintiff's cases create confusion on the issue, and therefore could not have outlined any "clearly established law" by which officers can mold their conduct.  Plaintiff admits as much, by conceding that *Lewis* requires intent but arguing that "the door is clearly left open for *possibility* that a Plaintiff may sustain a cause of action . . . under circumstances that differ from those that existed in [*Lewis*]." *Id*. at 11 (emphasis added).  When a defendant claims qualified immunity, the burden rests with the plaintiff to show that the law prohibiting defendant's conduct was clearly established.  *Crue v. Aiken*, 370 F.3d 668, 688 (7th Cir. 2004).  Plaintiff has only suggested that the issue may be in doubt, and therefore, Richard has a right to qualified immunity for his actions.

**D.     City Of Peru's Motion For Summary Judgment**

Defendant City of Peru seeks summary judgment against Plaintiff for any claims raised under § 1983.  Because there is no underlying § 1983 liability against Officer Richard, there is no constitutional injury, and so any § 1983 claim that might be filed against the City of Peru is a "born loser." *Pasiewicz v. Lake County Forest Preserve District*, 270 F.3d 520, 527 (7th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  There has been some confusion as to whether there actually are any § 1983 claims pending against the City of Peru, but for the sake of clarity, I will grant the City of Peru's motion.

**E.     Remaining State Claims**

With the federal claims disposed of, the proper course of action now is to remand the remaining claims back to state court.  *Williams v. Seniff*, 342 F.3d 774, 794 (7th Cir. 2003)

11

("[W]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations.") (citations and quotations omitted).  This suit was removed to federal court, and I know of no reason to forestall its remand back to Miami Circuit court to address the remaining state claims. Plaintiff's pending Motion to Exclude Opinion Testimony from Master Trooper McCullough Regarding the Course and Path of Shirley Trent's Vehicle Before the Collision [DE 43] is left to the state court to decide.

## CONCLUSION

For the foregoing reasons  Richard's Motion for Summary Judgment [DE 47] is **GRANTED** with respect to Plaintiff's federal claims under 42 U.S.C. § 1983.  The City of Peru's Motion for Summary Judgment [DE 44] is **GRANTED** with respect to any federal claims under 42 U.S.C. § 1983.  Plaintiff's state law claims, as well as its pending Motion to Exclude Opinion Testimony [DE 43] are **REMANDED** to Circuit Court of Miami County, Indiana.  The clerk shall treat this matter as **TERMINATED.**

**SO ORDERED**.

ENTERED: May 12, 2008

/s   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT